The first case today is number 191649, Axia NetMedia Corp. v. Mass. Technology Park Corp. Thank you. Thank you very much. Mr. Broderick, with your permission, I'd like to reserve two minutes. Why don't you come up to the podium? And I had a request on that. I have my voice. Can I speak from the table here? Because there's a number of documents I may have to refer to. Because of our recording issues, it would be better if you came to the podium. How much time did you want to reserve? Two minutes. Yes. If it pleases the Court, Your Honors, the issue before the Court is whether the arbitrator in this case had the authority to void the guarantee in this case. And I just want to give you a little bit of background. We have a guarantee itself. That is signed by Axia NetMedia. And the signatory to that is MTC, Mass. Technology Corporation. Like any contract, you have to have a promise on each side in order to have consideration for the contract. And in this case, MTC promised to build a 123, they called it a 123 network. And it was supposed to be 1,392 CAIs. Those are customers, essentially, who can buy services. And MTC didn't build that network. They built something that was much smaller. Counsel, why are you spending time on this issue? How is it relevant to the guarantee question? We're not reviewing the arbitrator's decision with respect to that contractual relationship. That has nothing to do with this case. Well, I'm raising this because it's in response to what MTC says. And MTC says, well, everything is fine. The NOA is still operating. Well, it's not. It's a completely different network operator agreement on a completely different network, much smaller. So there was a failure of consideration. And then we have the network operator agreement. KC, KCS, or whatever, has in the bankruptcy court, sorry, I'm speaking too loudly now, agreed to the reform contract that the arbitrator ordered. Isn't that correct? That's correct. So why doesn't that take care of the consideration problem? That's not the consideration for Axia NetMedia. Consideration for Axia NetMedia was they billed, Axia is willing to risk $4 million if the network that MTC agreed to bill of 1,392 CAIs, which Axia has provided them with a sustainability study indicating it was only sustainable if it was a certain size. It wasn't that size. So that doesn't take care of what the bankruptcy court did at all. We have a much smaller network. We have a much smaller revenue source. This is analogous to, let's just say I'm a father. And I have my daughter, and she's Dean of Hector. Excuse me. The guarantee is an entirely separate agreement from the operating agreement. Yes, correct. And the guarantee specifies that if there are any changes in that operating agreement or reformation, by whatever means, it does not affect the guarantee. So why are you focusing so much on the changes in the operating agreement when the guarantee specifies it has no effect on the guarantee? Well, the guarantee, the consideration for the guarantee of the promises of MTC to build a network of a certain size. So there shouldn't be a confusion by the court as to the obligations of KCST. Their obligations are not changed if MTC relieves them of obligations. But the guarantee does not have any provision in it which relieves MTC of their obligations to Axia for the guarantee. That's a critical issue. And that's why I'm raising the point. MTC is not relieved in any way to not build a network. There's nothing in the guarantee that relieves MTC of those responsibilities. Where is the provision in the guarantee that you're relying on? Is this two-point? The provision in the guarantee. Does it address breaches, material breaches of the NOA? The provision I'm referring to is the second paragraph. Where is it? 2.3? No, it's in the preliminaries. It's the second paragraph of the guarantee agreement. It's JA 1452. And it says, and we're giving the guarantee relating to the mass broadband, one, two, three, fiber optic network, MT is planning to construct as more fully specified, specifically defined in the network operator agreement. So there has to be consideration for the guarantee. And the guarantee is evaluated under mass law as a separate contract. We are not, as a guarantor, we're not a signatory to the NOA. We're not bound by that. So the consideration we got was we're going to risk $4 million for this big network, which is a big opportunity to make money. The network is much smaller. So the arbitrator couldn't cut our risk in half. The only remedy he could provide was to provide AXIA with rescission because there was a material breach of the guarantee itself. And what we received was the promises from NTC to perform. Nothing in the guarantee says NTC is relieved of its obligations to build the network. It just isn't there. There's no clause in there. There's simply that if KCST's obligations are relieved by MTC, that the guarantor would still have to perform. That's basic law. Can you address Judge Sarris's question? It seems to me that the language in Section 2.3, in particular, the guarantee, relies the argument that you're making. I mean, that provision specifically says, if I'm looking at the right provision, that this agreement referring to the guarantee and the liability here under should not be affected or impaired by any compromise, settlement, release, renewal, extension, indulgence, et cetera, of any of the obligations and liabilities of the net operator agreement. No, it says of the network operator under the network operator agreement. It doesn't say that if there are any changes in the network operator agreement. It says the obligations of the network operator. That's what's a lot about this. It really talks about it as if it's KCST breaching and what happens, but it doesn't mention what happens if MTC breaches. Exactly. So under the law, you would have to specifically have a release of MTC's obligations. And, in fact, in the arbitration, and it's in the record, MTC asked a complete waiver of defenses, and that was not agreed to. That language was not put in this guarantee. So the defenses that MTC, that AXI and that media had under the guarantee, are all preserved other than the ones that are spelled out here. That's the law in Massachusetts. So it's only relieved, it's still requiring a guarantee, if the obligations of the network operator are decreased. So the issue here is, did the arbitrator have the authority to make a determination as to whether the guarantee was void? He did. It was given to him by MTC. The guarantee provides the MTC with the option for arbitration. They went to arbitration. They specifically ruled or specifically requested that the arbitrator make a declaration as to whether the guarantee was void or not. Once you give the authority, you know, there's a First Circuit case, I believe, Judge Howard, you're on it, that says that once you give the authority of the arbitrator to decide an issue, you can't come into court after you get the result and say, no, you didn't have the authority. Well, the arbitrator had that authority. The district court misread that provision under the obligation section, and that is the interpretation of that. It's for the arbitrator. It's not for this court or any other court to substitute in their judgment on it. Counsel, when the arbitrator ordered an effect reformation of the operating agreement between KCST and Mass Technology, isn't that really tantamount to a renegotiation? That is specifically what the – that is a separate contract we're not a party of, and so that shouldn't affect the voiding of the guarantee. But the arbitrator was right. Mass law doesn't allow that. Excuse me. You say – you keep insisting, yes, they are separate, but they're also interrelated. In fact, there's a provision in the operating agreement that made clear that it will not even take effect until the guarantee is in place. That's true. So clearly, isn't that true? That's true. It's a conditioned precedent that can be waived, and there's a severance clause in the NOA that says that any provision that is struck by the arbitrator – Excuse me, but isn't – but then the – despite that provision, the arbitrator makes the observation that there's no evidence that the continuation of the guarantee would be important to Mass Technology in any renegotiation. How can the arbitrator make that observation in light of that provision in the operating agreement that makes clear it doesn't even take effect until there's a guarantee in place? Clearly, the guarantee was critical to Mass Technology. That's a separate contract, a separate party. Now, going to that, I understand, but going to that issue, the arbitrator has the authority here. Even if he made an error of fact or an error of law, this court, under the standard, can't substitute in its judgment. They can't do that. The NOA had a conditioned precedent. The conditioned precedent can be waived. MTC, they should have – if they wanted to challenge that, they had the obligation to go into the bankruptcy court and challenged it. They didn't. They went in knowing that that was the result of the arbitration. They're picking and choosing. They should have challenged that in the bankruptcy court. That's a final judgment in the bankruptcy court. They can't now come in here and say, well, we'll go to another court and we'll challenge that the arbitrator didn't have that authority to do that when they already confirmed it in the bankruptcy court. That was made very clear in the bankruptcy proceedings, that the confirmation with respect to the guarantee, the confirmation with respect to the operating agreement, they are being treated as entirely separate matters. In other words, it was understood by everyone in the bankruptcy court that the determination there had nothing to do with the guarantee, which is being dealt with in the district court. But they're challenging the NOA in this court, saying the arbitrator didn't have the authority to do what he did in the NOA, and they already agreed to that in the bankruptcy court. And embodied in that decision in the bankruptcy court is that the arbitrator had the implicit authority to do that. Necessarily, he would have had to. Are you essentially agreeing that he may have made a fact error in saying that MTC would have agreed to it without the guarantee, but you're saying that that is not enough to reverse the award? That is not enough to reverse the award. That would be a fact error or an error of law. And as long as he's plausibly interpreting the contract, and it's not the NOA contract that counts. It's the guarantee. He interpreted the guarantee, and that's all this court should be looking at is the guarantee. Was there a failure of consideration of the guarantee? And there was a failure of consideration of the guarantee. And the arbitrator had that authority. Any other issues could potentially be errors of law or errors of fact, and a court cannot substitute in their judgment. Just one quick question. I think I may have missed something you said. Explain to me why, in your view, what the arbitrator did with respect to prospectively avoiding the guarantee does not violate the plain language of Section 2.3 of the guarantee. Please explain that to me again. Okay, 2.3. It says, This agreement and the liability here under it shall not be affected or impaired by any compromise, settlement, release, renewal, extension, indulgence, changes in or modification to any of the obligations and liabilities of the network operator under the Network Operator Agreement, or any failure on the part of MTC to realize upon those obligations. So, in other words, if KCST had an obligation and MTC didn't realize they had an obligation and kind of overlooked it, then it still would not relieve the guarantor of the network operator's obligations. It's all directed to the network. They're not waiving anything by relieving the network operator of its obligations. You would have to have a clause in here that said, AXIA waives all of its defenses to any claim by MTC for this guarantee. There isn't any such clause. And in reading this under MAS law, that would have to be included in there. The only item that they're saying is this is a standard guarantee and it's the obligations of the network operator. Even if they overlook those, you still have, as a guarantor, the obligation to perform on the guarantee. So that is critical language. That was the intent of the parties. And even if he got it wrong and even if it's vague, that is a decision for the arbitrary. Counsel, before you step back, I'd like to ask one question. Would a ruling in your favor by us leave any room for MTC to go back into the bankruptcy court and argue that there now is no NOA agreement for the failure of the condition precedent and it's time to renegotiate from the beginning? Does it leave any room for that argument? They could make the argument, but I certainly believe they waived it. They assented to the NOA finding and it was implemented at that point in time with an arbitrary ruling there was no guarantee. Thank you. You've reserved some time. May it please the Court. My name is Robert Kaler. I'm counsel for Mass Tech. Judge Hillman's decision in the district court to vacate just this portion of the arbitration award was correct. It is our position that the language in the guarantee is probably the strongest argument. This was a tripartite contractual relationship that the dispute arose out of. It's a fairly standard one. When AXIA bid for the contract, it said it wanted to contract with Mass Tech through a subsidiary. So a traditional guarantor-obligor beneficiary relationship was established by two contracts, the NOA and the guarantee, each of which referred to the other, each of which incorporated by reference portions of the other, and each of which was dependent on the other. AXIA makes one point in its main brief that Mass Tech's argument would be much stronger about the interrelationship between the two contracts if there was some language in section 12.14, which was the language requiring the guarantee, that said that if anything happens to the parent, all bets are off. Well, there is such language. It's in section 5.1.5 of the Network Operator Agreement at appendix page 1416 and 17. That's the section. This is JA1416 and 17. That is the covenants, representations, and warranties section. And there's a specific provision that says, by the way, AXIA did not meet its covenant to represent that now and for the entire term of the operating agreement, the parent company will be solvent and won't be in bankruptcy. The key to vacating this portion of the award was that it was a problem with the remedy. We tend to stay away from, the courts tend to stay away from challenging the arbitrator's rationale. But if we look at this award in this way, tear apart the rationale and just look at the remedy, there's a problem with the remedy because the arbitrator doesn't have the authority to fundamentally restructure the party's contractual relationship. The rewriting of the underlying Network Operator Agreement was something that, in our view, we could have challenged because if you read Articles 5 and 6 of the Network Operator Agreement, it doesn't say this contract, which was publicly bid, has to be renegotiated any time it becomes commercially unreasonable. Were that the case, you couldn't put preparatory language in any contract that says everybody shall operate in good faith. But in point of fact, the rewriting of the Network Operator Agreement was not the major problem because at this point in time, Mass Tech could not get a better business deal with Holyoke Gas and Electric, their alternative operator, which was the draft contract that the arbitrator pulled these provisions out of in the marketplace. That's not the problem. The problem was that Axio was the bidder for this project. They run networks all over the world and they just said, we're going to go through a subsidiary. They set up a standard corporate structure, limited liability subsidiary. They limit their liability to third parties, but they maintain their commitment to the project through a guarantee. And the language of the guarantee, as Judge Lippis pointed out, is clear. The only way you could misinterpret that language is if you couldn't read it. That language says the consideration for this guarantee is some kind of Network Operator Agreement between our subsidiary and you, Mass Tech. It doesn't matter what it says. It doesn't matter what it's changed into. The whole point of the subsidiary is to just create a vehicle that will limit their liability to third parties. And so what it says is, even if you change the underlying Network Operator Agreement, we're always going to be here. Now, the arbitrator would have had the authority, theoretically, to rescind the entire contractual arrangement. But what can't happen, even in arbitration, is you can't walk into an arbitration with this kind of a tripartite contractual structure, as a public agency running a public safety-related network, and have a situation in which the operator claims breach of the underlying contract. Now, the guarantor, theoretically, in order to avoid having to pay out on the guarantee, could, as a matter of common law, assert defenses of the underlying contracting party whose obligations it had guaranteed. That's not the problem here. The problem here is that the arbitrator didn't invalidate or void the underlying contract. He reached out... He did find there was a material breach. He did find there was a material breach. And do you agree he was within the scope of his powers to find that? Yes. All right. So that means there was a material breach of the guarantee, right? No, it doesn't. All right. So help me through that one.  The guarantee is a guarantee of the subsidiary's obligations. If we were to bring claims against the guarantor, as we did, and the guarantor had to pay out, it would have the right to recoup in damages, monies that it paid out in a situation where Mass Tech had breached. That's what the law provides. And, in fact, that's what the arbitrator provided, and that's what Mass Tech did. Mass Tech paid the arbitration award shortly after it was finalized. And one of the things that we tried to do here was to do as little violence to the arbitration award as we could and comply with it as much as we could, consistent with the public interest, even though we strongly disagreed with it, because that's what the cases say. Counsel, the trial judge is acutely aware of how difficult it is to undo an arbitrator's award, and so he invokes some of the familiar language that might justify such an unusual step. He talks about how the arbitrator exceeded his powers in doing what he did, exceeding the powers that were actually accorded to him by the contractual agreement of the parties to arbitrate. In what way did he exceed his powers? For example, did he ignore some plain language of the agreement that might qualify? Yes, he did. He ignored the parties' agreement at the outset that the arbitrator has no authority to rewrite contracts to begin with. That was part of the record. When this arbitration started, the whole claim to reform the contracts, now admittedly that was directed towards the network operator agreement, but the concept was generic, that was dropped from their pleadings, and everyone agreed that he couldn't rewrite the contract. And in the final briefs just before the closing arguments, no argument was made the contract should be reformed, and as we pointed out in the brief, it was just mentioned in closing argument. But the other line of cases that Judge Hillman cited was that you can't ignore plain contract language, and that goes to the language of the guarantee. Arguably, he was also ignoring language in the network operator agreement. It's almost as if, and I think it's true, Judge Hillman looked at this situation from three or four different angles. It's a fairly unusual situation, but he looked at it from three or four different angles, and they all pointed in the same direction. The arbitrator can't do this. He's running afoul of three or four different lines of cases involving different situations. Okay, what's the plain language of the guarantee? Section 2.3, really, 2.3, 2.4, those provisions basically say you are contracting with Axia, not our subsidiary. In a sense, they're basically saying whatever deal you make with our subsidiary, we'll guarantee it. That's a fundamental aspect of the contract structure, because nobody would have ever negotiated with a subsidiary in bankruptcy that has six employees and $100,000 in the bank as their document 270, I think, in the bankruptcy court, the disclosure of the reorganization shows. It's a shell, and they would not reach the responsibility threshold for a public contract like this. So what a guarantee basically says is, look, we've set up a subsidiary to limit our liability mainly to third parties, and this is standard in all tripartite relationships of this type, and we're putting a cap on the guarantee, $4 million, but basically we're here, and we're not going to go anywhere. No matter what happens, as long as our subsidiary has any obligations at all under the network operator agreement, we are going to guarantee those obligations. And that was fundamental to the contract structure here, and what the voiding of the guarantee did was it obliterated that. Can you go back to 2.3 and 2.4, that's what you're relying on, and where it deals with breaches by MTC, not the network operator, but I think you said at some point that it was silent on what happened with breaches by MTC. Yes. Is that right? Yes. Okay. So does an arbitrator have certain authority to figure out what to do if there's a breach by MTC, if the guarantee doesn't express any limitations on that? Well, he's got to read the guarantee strictly. If it doesn't address it, he can't reach out and say, I'm going to void the guarantee on account of a material breach by MassTech. One of the things that a drafter of this type of guarantee would not do is say, look, you can invalidate the guarantee in the event the beneficiary breaches. It's a one-way guarantee. And the simple reason for that is that the guarantee becomes useless if, in fact, the subsidiary can just claim breach, and then the guarantor says, well, my guarantee is invalid. Now, I'm not saying they would have no defenses to the implementation of the guarantee, but the key problem here is that the arbitrator entered an award in futuro. He cured the failure of consideration for the underlying network operator agreement, in theory. He required the repayment of the $3.9 million. They hadn't reached the cap on the guarantee. Tried to return things to the status quo. Arguably, and certainly it was argued, he did not have the authority to do any of that. However, we could live with the rewrite of the network operator agreement. It was a rewrite of financial terms. What we cannot live with is the prospect of, for the next five years, people out in western Massachusetts being unable to get 911 service because the network goes down because maintenance hasn't been done over the course of a period of months. And instead of having a large public company like Axia, responsible for the network and incentivized to operate it, which is what they promised, we just have a shell. That he cannot do. And if there's anything that is central to the case law, it's, look, if you agree to arbitration, then you're settled with it. But there's something unusual in this case, in that the arbitration clause itself said that all issues in the arbitration will be decided in accordance with Massachusetts law. In another part of the operator agreement, there was a general choice of law. I guess we keep dwelling on 2.3. I gather you're saying that, so the guarantee runs one way. What mass technology is concerned about is assuring that somebody will be there to answer for the failures of the operator. I mean, it would be odd to include in the guarantee what happens if your client were to default in its obligations. That's not what the guarantee is all about. That is precisely correct. And I shouldn't limit myself to 2.3. I'm noticing 2.2 expresses the concept another way. It says the guarantee will be continuing in absolute, shall remain in full force in effect, quote, until all obligations of network operator under the network operator agreement have been fulfilled. Now, that means regardless of what they are or what they turn out to be or what people change them to be or what an arbitrator decides they should be, AXI is saying, I'm always going to be here. And even if the subsidiary claims that you breached, I may argue with you over whether I had to perform, but no one's going to come back and tell you that for the remainder of the contract, you have to just live with our subsidiary and our guarantee is gone. There are a number of things the arbitrator could have done consistent with Massachusetts law. I mean, this is way out there as far as Massachusetts law is concerned. We don't normally concern ourselves with rationale of an arbitration award. And I come back to that distinction between... Well, why is that? A material breach of a guarantee, a term of a guarantee, sometimes voids it, right? That's not crazy under Massachusetts law. No, I wasn't referring to that notion. I was referring more to the whole concept of a public agency bids a contract, puts it out, it gets signed up through a subsidiary, and there's a breach claim by the subsidiary and then what winds up happening is both parties, the subsidiary and the parent, go into court on the same day and try and sort of void all their obligations. It winds up in arbitration. And instead of assessing damages for breach, which is what you would expect, or alternatively under Massachusetts law, rescinding the contracts and providing that remedy, of course there was no finding of fraud or disrepresentation, the arbitrator sort of decided to fashion his own remedy and rewrite the one contract, the underlying contract, and say you remain bound by that for five years. And the guarantee, while you've repaid it, but it's gone. That does enormous violence to the basic contract structure that was established. Well, let's take it to the other extreme. If MTC had provided no CAIs whatsoever, hadn't performed at all, you would still say the guarantee is rock solid? Well, no failure of consideration there? There would be an argument in that instance for rescission of the entire contractual arrangement. And there's no question that in that situation an arbitrator or court could find, look, there was complete failure of consideration, and therefore there are no obligations binding under the Network Operator Agreement or the guarantor. If it would be permissible to find a failure of consideration in that circumstance, why are we in a position to draw the line someplace else? It would be permissible to find a failure of consideration only for both contracts together. One could not find a failure of consideration for one contract and not the other and fashion different remedies. Now, if we assume here that the arbitrator found a failure of consideration. But the only thing, correct me if I'm wrong, the only thing that's in front of us is the guarantee. Well, no, it's not that simple, because the guarantee itself refers to the underlying Network Operator Agreement. It is impossible to view a tripartite contractual relationship. Well, then let me ask you the question that I asked your brother, which is that if we rule in his favor, does that then give you the opportunity to argue in the bankruptcy court that there needs to be a complete renegotiation because the contract itself is out, ban away? We probably would try that, but I'm not sure that it would be successful. Okay, why not? Because under these circumstances, I'm not sure there's a rule of law that would apply, but I don't think it would be practical. There were some elements of practicality in the judgments that we made about whether to challenge in both four. And if there's criticism of that, it should be directed at me. Counsel, why is the failure of consideration even relevant now? Because the arbitrator addressed that issue in his ruling in the relationship between KCST and your client, indicated what remedies would address that failure of consideration. You had to pay money back that you had gotten under the guarantee, for example, things like that. And so he, in effect, reformed that contractual relationship and thereby addressed the failure of consideration. But I gather it's your position, okay, that was part of the deal. He did that, but now he has completely undone the guarantee, which the parties always said. The presence of that guarantee was a condition proceeding to the formation of this underlying agreement. So he reinstates, in effect, the agreement, but he advocates the guarantee that the parties always understood it was a condition proceeding to the implementation of the operating agreement. I mean, that's basically, from your point of view, what happened here. And that's why he's undone the entire contractual relationship among these three parties. I think that's correct. And the better answer to Judge Howard's question maybe is I don't know. It's we tried, we considered challenging in both jurisdictions, but that creates a conundrum where you have the bankruptcy court not knowing what the district court would do and how can I challenge the guarantee in the district court if I'm still challenging the whole underlying network operator agreement. So I made a judgment that the most economical and most likely to do minimal collateral damage to other creditors in the bankruptcy, there were a variety of considerations, and we made the judgment that we should just live with the rewrite of the contract, but raise the one issue we felt we could not lose on, which was he can't explode the contractual relationship and make us contract with a subsidiary for the next five years. He just can't do it. Thank you. Thank you. I just want to quote from One Beacon v. Swiss Reed, which is one of Judge Saras' decisions. I don't have the exact page, but in the decision, Judge Saras says, nor is a reviewing court authorized to reject an arbitrator's honest judgment as the appropriate remedy if the contract gives him the authority to decide the question. In this case, the arbitrator could have voided the guarantee. He could have voided the NOA. KCST sought specific performance of the NOA, which actually had terms in it to reform the contract in itself. That's why he did that. My client's only remedy was you've got a much smaller network. It's not sustainable anymore, so we're out from underneath the guarantee. He can't have our guarantee in half. He couldn't do that. So we're not bound by KCST's demand for a remedy. Our contract is with MTC, and our contract, it was failure of consideration for that because they didn't build what they said they were going to be. We wouldn't have taken the risk to guarantee $4 million if they were going to build a tiny little network that couldn't sustain itself. Under MTC's theory, we signed the guarantee. No matter what they do, we can never get relief from anything. They didn't have to build it. They could just take KCST's money and say to us, well, you've got to pay on the guarantee forever. That's just not the law. And all of these issues, they were given to the arbitrator to decide by MTC. They're questions of fact, questions of law, and the remedies were for the arbitrator. No court can substitute in their own judgment. And if there's a close call and even a legal error, it doesn't matter. Even if it's silly, the findings of fact, this court is bound to respect the arbitrator's decision and can't substitute in its own decision. Thank you. Thank you both.